**Clyde O. WILLIAMS et al., Appellants,**

v.

**NATIONAL SURETY CORPORATION et al., Appellees.**

**No. 16925.**

United States Court of Appeals Fifth Circuit.

June 30, 1958.

R. Clifford Fulford, Birmingham, Ala., for appellant.

James E. Clark, Birmingham, Ala., London, Yancey, Clark & Allen, Birmingham, Ala., and Richard U. Simon, Fort Worth, Tex., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

John R. BROWN, Circuit Judge.

With all of its 1700 pages of typewritten evidence, 170 more of tran-

script, endless brief of 533 pages, replies, rejoinders, surrejoinders and replications, this case when it finally boils down has small compass for us. That is so because of the inherent nature of the several responsibilities of trial court, of jury and appellate court in the final winding-up of a complex case. A hard thing for any loser to accept is that we do not sit to review the facts nor, as the briefs with their lengthy treatment of it unwittingly asks us to do, are we to sift and weigh, accept and reject, each piece of evidence either separately or as it fits into the mosaic pattern, to determine what conclusion out of this mass of affirmation and denial was the truth. That was for the jury provided only that first, the evidence had that minimal quality required to allow conflicting inference, and second, that the cause was not, over timely objection, submitted in disregard of accepted standards. The case becomes all the simpler because, as to these two conditions, the first is not really presented at all since no motion for instructed verdict was made and for the second, the complaints now made turn out in many respects to have been made for the first time here. The case is simpler too because while tried below as a consolidation of two, only one is before us and the other remains pending in a sort of limbo.

The dispute which has precipitated this multi-party Donnybrook likewise has a simple frame. It is a suit by a subcontractor against the contractor to recover the unpaid balance of the contract price for the performance of the painting on the huge 1352 unit Public Housing Administration apartment project named Desire located in New Orleans, Louisiana. Ball [1] was the prime contractor under the $11,000,000 contract. W. & B.[2] was the painting subcontractor under the contract of November 1953 for an initial subcontract price of $268,000.

In the summer and fall of 1955, W. & B. and Ball became embroiled in a controversy over the sufficiency of W. & B.'s performance. Not being settled, Ball removed W. & B. from the job, completed the work itself and, it claimed, spent considerable money to complete and correct prior deficiencies in W. & B.'s work. At the time of W. & B.'s removal Ball had previously made progress payments aggregating $179,625. Ball claimed it owed nothing further. W. & B., on the other hand, claimed that it had then completed approximately 97% of the work and that Ball owed it the balance of approximately $86,000, plus extras aggregating another $30,000.

Thus it stood when the litigation commenced. It did not really change even though from the necessity of suit and countersuit against and by the respective sureties for Ball and W. & B., it has a deceptively complex facade.

W. & B. sued Ball [3] in Civil Action 8328 for the contract balance and claimed extras.

In its defense Ball denied performance by W. & B. and asserted that it had expended sums to complete the work and correct deficiencies for which it was due full credit. Ball subsequently filed a suit (Civil Action 8564) against U. S. F. & G., the surety for W. & B., who impleaded W. & B. This was for the recovery of all sums spent by Ball in excess of the unpaid balance of the original contract price. The two cases were consolidated for trial without objection. On the consolidated trial the battle lines were sharply drawn with W. & B. claiming that Ball owed it approximately $86,000 (plus extras) and Ball claiming that W. & B. owed it some $20,000. It all turned on whether W. & B. had or had not substantially performed the subcontract, and if not, the extent to which Ball had incurred costs to complete or correct

1. R. F. Ball Construction Co., Inc. of San Antonio, Texas.

2. Used as a convenient reference to a partnership of Clyde O. Williams and Hoke S. Brantley of Birmingham, Alabama.

3. The suit was against the seven nonresident corporate sureties on Ball's performance bond. Ball was not a party. But it was in fact and legal effect a suit against Ball and will be referred to in that manner.

the work. The jury on a general charge which required the return of separate verdicts in each case brought in a verdict for defendant Ball in W. & B.'s suit (C.A. 8328) and for plaintiff Ball in its suit (C.A. 8564) against W. & B. for $15,000 which amount was subsequently reduced to $11,630.89 by Ball's remittitur. Final judgment for defendant Ball was entered in W. & B.'s suit (C.A. 8328). No final judgment [4] has yet been entered in Ball's suit against W. & B. Only the judgment in W. & B.'s suit (C.A. 8328) is now before us.

■ This circumstance, ignored altogether by W. & B., is one which, on the basic merits of the appeal, we regard as decisive. For in W. & B.'s suit, W. & B. was the plaintiff. Apart from procedural errors later discussed, W. & B. must demonstrate that there was no evidence to sustain the jury verdict against it. In our view W. & B. fails in any such effort. First, because this is really not open to review since no motion for directed verdict was made by it at any time and this is ordinarily indispensable. Stokes v. Continental Assurance Co., 5 Cir., 242 F.2d 893; De Fonce Construction Co., Inc., v. City of Miami, 5 Cir., 256 F.2d 425. Second, if an examination of the record is nevertheless undertaken, it demonstrates an adequate basis in the evidence.

■ In this examination the nature of W. & B.'s burden is important. On it rested the burden of proving that it had (a) substantially performed its contract thus (b) entitling it to the unpaid balance of the full contract price (plus whatever extras were established), and that (c) to the extent that the contract had not been fully performed, the cost to Ball for such completions or corrections was less than the unpaid balance, thus leaving some amount yet due. That was the theory of the lawsuit submitted

with articulate skill in the Court's general charge which was fully accepted by W. & B. without objection of any kind. The matter is then to be tested in the light of whether the plaintiff established all of these as a matter of law, rather than, as argued so vigorously in these lengthy briefs, whether the *defendant* Ball established in its countersuit (C.A. 8564) with requisite certainty the items and the aggregate of the added costs for completion or correction.

■ W. & B. cannot meet this test. A few brief illustrations will demonstrate that in this lengthy record, this was a jury matter. There is, first, the question of substantial performance by W. & B. This whole controversy was precipitated by a dispute over whether, on some 10,000 interior metal doorframes, the less expensive Penetrex varnish sealer applied by W. & B. as the first field coat (over the factory shop coat) complied with the specifications for the more expensive Du Pont Du Lux metal protective paint or its equivalent. This was a hard fought issue and the jury was certainly justified in its implied finding that this was not compliance with the contract, that use of Penetrex for the metal frames had never been authoritatively approved, and that long after objection was made to its use, W. & B. persisted. The context of this dispute raised other and more disturbing inferences whether this action was perhaps due to complicity between W. & B. and the Chief Inspector of the project whose discharge uncovered the fact that reports of complaints to him by subordinate painting inspectors had been suppressed out of partisan favoritism for W. & B. with whom he had a close personal association *if not some outside business interests.*

Another incident had the dual implication of plain violation of contractual

---

4. In C.A. 8564 the defendant surety, U. S. F. & G. impleaded its principal, W. & B.; that phase was expressly severed. After judgment in C.A. 8328, the Court, presumably under F.R.C.P. 54(b), 28 U.S.C.A., ruled in C.A. 8564 that there was just cause for delay and prescribed that the judgment in favor of Ball against W. & B.'s surety would be entered ten days after receipt of the mandate of this Court in the appeal from C.A. 8328 if we affirmed that judgment.

obligation and overtones of complete indifference as a matter of business morals. The specifications called for a mixture of Dianol, an insecticide, for wall and ceiling paint for bathrooms and the kitchen-dining room areas in all of the 1325 units. The evidence was overwhelming that on the basis of maximum purchases of Dianol, W. & B. had mixed less than 1/10th the required amount. On a minimum, conservative estimate of the amount required for a proper mixture, the cost not actually incurred was charged back as a credit of over $5,000.

Likewise, the specifications called for top and bottom of all interior doors to be brush-painted. Admittedly this was not done in most instances, and Ball's men had to do this on over 10,000 doors. W. & B. claimed this was not their responsibility since it required unhanging and rehanging of the doors at considerable expense. It was certainly an item of importance for whether, as W. & B. contended, such painting would not take over a few minutes, or, as Ball asserted, it took over 20 minutes for each door, the cost for labor at the high hourly rates ran into thousands of dollars.

To this must be added a major and substantial expense incurred later by Ball in repainting, retouching and refinishing interior walls and ceilings of hundreds of these rooms, because the finish was declared by the Housing Authority painting inspectors to be unsatisfactory. Whether this was due to poor workmanship by W. & B. or in part to thinning the paint excessively with water was for the jury. Similar retouching and cleaning up was required for exterior painting, removal of paint splotches on plumbing fixtures, floors and the like. That the jury could find that much of it was undoubtedly due to long passage of time since the work had been done did not compel any helpful inference. This is so since the subcontractor and the prime contract [5] expressly imposed the obligation to turn over the job at final completion date in good order. This in turn placed the burden of deterioration or damage done by others on the shoulders of W. & B. with the only escape offered being the opportunity to prove that such damage was due to the "direct negligence of Ball" since no others were mentioned.

As part and parcel of the evidence on the nature and extent of deficiencies, there was also persuasive testimony showing that these out-of-pocket expenditures for labor and materials ran into figures in the neighborhood of $60,000 to $70,000. Whether these expenses as incurred were really necessary to correct

---

**5.** In the prime contract, General Condition 9c provided:

"All material and work covered by partial payments made shall, thereupon become the sole property of the Local Authority, but this provision shall not be construed as relieving the Contractor from the sole responsibility for the care and protection of materials and work upon which payments have been made or the restoration of any damaged work, whether such damage has been caused by the Contractor or by other contractors of the Local Authority or others, or as a waiver of the right of the Local Authority to require the fulfillment of all terms of the contract. In the event the work of the Contractor has been damaged by other contractors or by others than the employees of the Local Authority in the course of their employment, the Contractor agrees to restore such damaged work without cost to the Local Authority and to seek redress for his damage only from those who directly caused it."

The subcontract carried this forward in Article I:

"* * * Terms, Conditions and Stipulations of the General and Special Conditions of the General Specifications [prime contract] shall govern and apply as if written herein" and specifically provided in Article V that

"The Contractor [W. & B.] shall effectually secure and protect its work and shall bear and be liable for all loss or damages of any kind which may happen to the work * * * at any time prior to the final completion and acceptance thereof.

"[Ball] * * * shall not be responsible for any damage done to the work or property of * * * [W. & B.] unless such damage shall be caused by the direct negligence of * * * [Ball]."

W. & B.'s work, whether Ball was saddling W. & B. with expenses in no way reasonably related to its contract work, were all questions, hotly disputed, which it was the function of the jury to resolve. If all of this left the jury reasonably unsatisfied that W. & B. had pointed out with requisite certainty the amount which Ball reasonably ought to have spent to complete the contract properly, then the plaintiff failed in its burden under the theory of the case outlined in the accepted jury charge and this allowed the jury to return a verdict for defendant Ball. The jury did not have to go further and, by adding here, subtracting there, accepting this chargeback, rejecting another one, find the precise or substantial amount which Ball had spent.

This brings us then to the asserted procedural errors which we may likewise discuss in brief fashion.

■ W. & B. claims it was error to consolidate C.A. 8328 and 8564 together for trial. Actually, we think this was never objected to. But clearly it was within the Court's discretion under F.R.C.P. 42. They involved common issues of fact and law. Indeed, so much did they that the Court, without objection of any kind by W. & B. charged that a verdict in one of the cases in favor of W. & B. excluded a verdict in favor of Ball in the other, and vice versa. Moreover, it was the mere circumstance that W. & B.'s suit had to take the form of one against sureties amenable to suit and service of process in Alabama rather than against Ball directly, that made it necessary for Ball to file a separate suit in reconvention. Had Ball been a direct defendant, its claim for reimbursement in excess of the balance of the initial subcontract price would have to have been asserted as a compulsory counterclaim, F.R.C.P. 13. As such all would have been tried together. And, as a substantive matter, there was no confusion. There was a single underlying issue: had W. & B. substantially performed? It was at the heart of both. One trial was enough.

■ Complaint about rulings on evidence is twofold, one covering exclusion of plaintiff's proffers and the second, the admission of testimony offered by Ball. The former has to do primarily with charts and rather elaborate summaries of figures prepared by the witness Williams, a public accountant who was a brother of partner Williams. The data in the main were drawn from books, invoices, payroll records, vouchers, etc. kept and produced by Ball. Little was original evidence within the personal knowledge of the witness. We need not discuss this in detail for a consideration of the whole record shows that the witness stated his views in lengthy detail and the charts or summaries were there for the jury to see, although not admitted as intrinsic pieces of evidence establishing the facts or conclusions portrayed. Moreover, the Court in its general charge, gave the jury full liberty to consider and weigh these as they would arguments of counsel as being the proper inferences to draw from the various books, papers, records, vouchers, payrolls, and the like used by the witness in reconstructing the picture.

■ W. & B. seeks reversal because one exhibit admitted in evidence and supposedly given to the jury for its use during deliberation apparently never got there and has since been lost altogether. Neither Court nor Ball's counsel are shown to have been responsible for this, nor has W. & B. demonstrated that absence of this one exhibit previously received by the jury was harmful, F.R.C.P. 61.

■ The second attack centers primarily on the detailed exhibits from Ball's permanent record showing payrolls, vouchers, invoices, and data supporting the expenditures of the $90,000 to $103,-000 made by Ball to complete and correct the work. Actually, the objection of W. & B. comes down to the assertion that, assuming the records and exhibits were admissible as business records kept in the regular course of trade, 28 U.S.C.A. § 1732, as they most assuredly were, this was not sufficient evidence to estab-

lish that the items which the exhibits disclosed were expended were reasonably, necessarily, and actually spent by Ball because of W. & B.'s default. As such, that is but another facet of the basic complaint on the sufficiency of the evidence which we have already held met the legal test. It is at this point, of course, that the burdens imposed by the inherent nature of W. & B.'s suit differs so much from Ball's suit against W. & B.'s surety. We ought not, and do not on this appeal, intimate whether such exhibits and supporting testimony was sufficient to sustain Ball's burden of proof in the other suit as a basis for a recovery in excess of the unpaid balance of the subcontract price.

None of the other phases concerning rulings on evidence properly presented for our review show any matter of harmful error.

We are of the same view concerning W. & B.'s objections to Ball's written requested charges which the Court gave. These must be distinguished from the Court's general charge to which W. & B. made no objection whatsoever. Except for a trial practice which the Court followed here and which, in the general administration of justice, we think carries with it so many unsatisfactory consequences, we would content ourselves with a brief statement that these written charges have been examined in detail by us and found supportable.

We can understand fully why, as this twelve-day trial was approaching its close on a late Saturday evening, the Judge, sensitive to the personal situation of the jurors and the fact that he was due to open a term of court the following Monday morning in a distant Division, desired to save as much time as possible. Presumably because of this the Court stated that either party within five days after the receipt of the verdict could file written objections to written requested charges given or refused.

We believe the whole purpose of the enlightened Rules of Civil Procedure is thwarted by such action. The Rules, uniformly free of precise technical formalities, require an objection to charges to enable the Judge to first have the benefit of the competing views of counsel in keeping with that approach of our adversary system, and second, to correct a mistake before it becomes irretrievable. If the written objection by counsel were merely to preserve a record of contentions previously urged and intelligently considered and overruled, a good deal of latitude would have to be left to the Judge in practical adjustments agreed to by all in the interests of time. But here, for example, if any one of these charges were in error in a vital way, this practice might compel us to reverse this whole case even though we were convinced that had the matter been called to the Court's attention, it would have been then and there corrected. Fortunately, that was not the case.[6]

We deem it wholly unfruitful to add further to the discussion and

6. Three of these charges (Nos. 8, 9, 10) were an instructed verdict on three claimed extra items as to which the Court in its general charge held the evidence insufficient to show compliance with the contract requirement of a written change order. No. 22 submitted the Dianol insecticide matter more specifically but in full keeping with the theory of the Court's general charge. No. 24 was not subject to the specified complaint that it, and the charge as a whole, foreclosed the jury on whether Penetrex complied with the contract. Number 36, in the context of the whole charge, merely made explicit that, since the nominal defendants were surety companies, the jury should give them the same credit it would find due Ball for amounts expended by Ball to correct and complete the work. No. 39 was a substantial paraphrase of the provision of the prime contract, see note 5, supra, that for the cost of reconditioning work damaged by others, W. & B. had to seek redress from the party who actually caused it. No. 41 was but a submission that under the subcontract and prime contract if W. & B. was in default and declined to remove deficiencies, Ball was entitled to do the work and for whatever sums Ball had to spend, the sureties would be entitled to the same credit as Ball.

treatment set forth adequately by the District Judge in his written opinion, Williams v. National Surety Corp., D.C. Ala., 153 F.Supp. 540, covering the circumstances and legal consequences of the jury verdict being returned on Sunday. We approve this holding. We likewise consider inconsequential the episode of the purported objection by Ball's counsel made during the exchange between the Court and members of the jury as they requested further instructions shortly before they returned a verdict Sunday afternoon. It was unimportant in its content and since the jury within ten minutes did exactly the opposite to that which counsel's voluntary objection stated they could do, we fail to see how it could have had a harmful effect.

This brings us to that which occupied the major portions of the opening brief by W. & B. that in the general manner of conduct in making objections, insinuations, voluntary statements, interruption of witnesses, Court and counsel, counsel for Ball without adequate restraint and timely corrective action by the Court infected this whole trial with confusion and unfounded implications. We say only that this was a hard-fought battle in which neither of the able and vigorous votaries for either side either asked for or accepted any quarter, Maryland Casualty Co. v. Reid, 5 Cir., 76 F.2d 30. The Judge seemed always to be in supreme command of the situation. In the course of this lengthy trial, whatever might have been the momentary diversions from objections or running colloquy of counsel and Court, the testimony was exhausted of all relevant inferences and there is not the slightest suggestion that as the jury had to make its fateful choice between W. & B. and Ball, it had been improperly swayed by these actions. What is more, W. & B. cannot, in this record, demonstrate that the result below is so contrary to inherent justice that a new trial should have been given or that under Whiteman v. Pitrie, 5 Cir., 220 F.2d 914, we should find error in the denial of a new trial.

A trial of keenly disputed issues was had. The jury, on proper instructions or those in no way objected to, was given the case for decision. The verdict had to go one way or the other. It went for Ball. There it ends.

Affirmed.