Louis LEVY, etc., et al., Appellants,

v.

D. T. MANGET, Jr. et al., Appellees.

No. 18841.

United States Court of Appeals Fifth Circuit.

Aug. 31, 1962.

Rehearing Denied Oct. 8, 1962.

**250**

Charles Clark, Earl T. Thomas, Jackson, Miss., Joseph Nurnberg, New York City, for appellants.

Robert C. Cannada, George H. Butler, Jackson, Miss., for appellees.

Before RIVES, CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case is ostensibly a stockholder's derivative suit. Like so many, especially as to corporations which are closely held, the complaining stockholder, garbing himself in the appealing robes of high principle and equity, is simply using the corporate fiction as an acceptable vehicle by and through which he can have some more effective relief against co-owners whose actions are claimed to have been fraudulent toward him. Just as often, the relief in the name, and for the benefit, of the corporation is more effective because, recognizing the immutable economic principle that the corporate fiction itself does not alone generate wealth, some new party has entered the picture to put the blood in the turnip, to make the purse out of the sow's ear. That new party may often be in fact the innocent party who learns to his actual amazement that by reason of legal theories whirling around the fictional corporate entity, he had duties and obligations toward a variety of people whose identity, status and position were perhaps completely unknown to him.

Adding a good deal to the everyday concern generated by the opportunities for abuse which has earned for this type of litigation the name of "strike suits", are several unique factors in this case. Where ordinarily the champion for the corporation is the still small voice of a very, very minor stockholder, here it is that of the majority stockholder. Not only majority, practically full owner. More than that, the person claimed to have done him in (though for this drama the victim is the corporation) is one to whom that majority stockholder has given an unlimited power of attorney to vote all stock (including that of the majority stockholder) for necessary corporate action to effectuate the complete sale or other disposition of all assets of the corporation. To cap it all off, the trade made by the allegedly defrauding party called for a sales price within a few dollars of the very price which the now complaining stockholder offered to the very same buyer. And finally, to satisfy the theory of fraud on the corporation and at the same time escape the decisive impact of the broad power of attorney given to a co-owning stockholder, the complainant puts the finger of blame on, of all persons, one who was forced into a trade to buy the assets of the corporation to protect himself against serious damages brought about by the corporation which, without the slightest shadow of an excuse, repudiated a formal valid lease of the premises made and executed with all of the solemnity of a Mississippi contract by the President and Secretary of the corporation.

While not exactly expressed in quite these terms, this was simply too much for the Trial Judge. He held for the outsider, the purchaser of the assets, and denied relief to the corporation and through it the champion who sought to gain greatly, not because the trade was unfair, or the price inadequate, but because subsequent events gave the dilapidated property a new and increased value wholly unrelated to the capabilities of this failing enterprise and equally unpredictable at the time the advantageous sale was made. We agree and affirm.

■ As we view the case, there is not really a significant difference over a significant principle of law. The case turns on the facts. And the facts have been found by the trial Judge. Natural as is the desire that we take a new look at these facts, Williams v. National Surety Corp., 5 Cir., 1958, 257 F.2d 771, that is not our function. We are bound by them unless they fail to pass muster under the clearly erroneous concept. F.R.Civ.P. 52(a), 28 U.S.C.A. Since it took the Judge twenty pages of foolscap to make a non-argumentative recitation of the details, it is evident that ours must be a

sketchy (and hence possibly inaccurate) simplification of them.

What the parties [1] are scrapping over is the Laurel Textiles, Inc. which owned and operated a textile mill in Laurel, Mississippi, Levy's theory, broadly stated, is that Laurel was defrauded when Valentines, ostensibly selling all of the corporate assets [2] to Manget, Jr. actually accomplished this asset sale subsequent to the time Manget, Jr. purchased their stock ownership. Consequently, the theory proceeds, it was a case of self-dealing by a stockholder having substantial control over a corporation whose assets he was acquiring for his personal benefit. Following this, Manget, Jr. is brought in on the theory that having first acquired a substantial stock ownership in the corporation, Manget, Jr. owed a fiduciary duty to the corporation (and to fellow stockholders) which he breached. Failing on this, the alternative theory is advanced that in any event, Manget, Jr. knew that Valentines were defrauding Levy (and hence the corporation) in the trade as made and, regardless of Manget, Jr.'s duty to Laurel, he had the usual obligation of accounting for all properties knowingly received by him through another person's fraud.

In the fall of 1955, all stockholders of Laurel were aware that the end was in sight. Here was an ailing antequated mill suffering continual losses incapable of competing with more modern plants and able, at times, to meet payrolls only by selling fixed assets. Laurel owed approximately $148,000 although the number and amount of debts was sufficiently uncertain that Valentines, actually in full charge, were unwilling to make a warranty about them. Of the 1385 shares of the corporate stock, it now seems established that Levy had the beneficial ownership of 970 shares or approximately 70%.[3]

The remaining 30% was owned by Valentines. But the Valentines had much more. By a series of transactions, the issuance, reissuance, pledges, transfers and assignments of the stock which Levy acknowledged from the witness stand was too complicated even for him to explain, the Valentines held in their name all of Levy's stock to secure the

1. The cast of characters is:

Laurel: Laurel Textiles, Inc.

Levy: Louis Levy, the beneficial owner of approximately 70% of Laurel's stock.

Valentines: Includes generally J. W. Valentine Co., Inc., a New York Corporation (the exclusive sales agency for the output of the mill); J. W. Valentine, its president; and Henry D. Valentine of New York (J. W.'s brother), an attorney, its general counsel, and its fully authorized spokesman relating to its stockholder interests in and direction of the transfers of Laurel.

Manget, Jr.: D. T. Manget, Jr., of New Orleans, the son of Manget, Sr. (of Georgia), successful cotton merchants, warehousemen and related activities.

Berkowitz: A. Berkowitz, Esq., an attorney of Birmingham, Alabama, who for a considerable time was representing Levy in the attempt to sell Laurel or its assets.

2. This excluded cash, unfinished goods in the mill, and accounts receivable.

3. As of October 30, 1954, the stock book showed Levy owning the following:

| Certificate Number | Number of Shares | |
|---|---|---|
| 62 | 415 | |
| 66 | 139 | |
| 67 | 416 | |
| | — | 970 |

Valentines' ownership was:

| | | |
|---|---|---|
| 68 | 415 | 415 |
| | — | —— |
| | | 1385 |

On August 30, 1954, Levy's 139 shares (Certificate 66) were transferred to Valtines. On October 28, 1955, Levy's 831 shares (Certificates 62 and 67) were transferred to Henry D. Valentine, nominee, pursuant to the power of attorney later discussed.

payment of an old debt of $70,000, another debt of $5,000 owed by one of Levy's dubious friends, and, more recently, a $15,000 debt owed by Levy to another and redeemed by the Valentines (with subrogation) at Levy's urgent request.

Berkowitz, a Birmingham lawyer, apparently experienced in the sale of businesses, became Levy's attorney in the fall of 1955 under a mission whose objective was to straighten out Levy's stock ownership in Laurel, secure cancellation of a number of the apparent notes due Valentines, but which he claimed were not really due, and perhaps more important, find an advantageous buyer for Laurel's assets (or the stock). From some old family connection, he had known Manget, Sr. and thought of these cotton merchants as a likely prospect. Nothing specifically came of this. But it was at his recommendation (and with his draftsmanship) that Levy executed in October a very broad irrevocable power of attorney (with full power of substitution) to Valentines. It acknowledged Valentines' security interest in Levy's stock, and authorized Valentines to vote the stock in any way thought fit by them in the dissolution of the corporation or distribution or disposition of its assets.[4]

In the course of the energetic efforts of Berkowitz, all of which were with Levy's full knowledge of every plan in Berkowitz' mind,[5] Berkowitz obtained from Valentines an agreement for sale of Laurel's assets to him for $280,000. This ultimately developed into the offer of Manget, Jr. to purchase the assets for this figure. But after meeting in Laurel, Mississippi, on December 9, 1955 for the purpose of consummating this trade, it collapsed when Valentines were unwilling to warrant the corporate liabilities. While slightly out of chronological order, we have mentioned this here to emphasize that Manget's first effort to purchase assets was due directly to the vigorous efforts of Levy's representative Berkowitz, and the price offered to Manget ($280,000) was substantially the same as the price ultimately paid ($275,000).

While Berkowitz' efforts to interest Manget, Sr. in purchase of the assets was unsuccessful, this probably precipitated Manget, Jr.'s first interest in the properties. He was not interested in purchasing. Manget, Jr. thought the properties were suitable for storage of cotton. And after some negotiations with Wright, the President living in Laurel, and David Welch, the Secretary, and Mississippi counsel, also of Laurel, the corporation executed a formal lease on November 5, 1955 to Manget, Jr. On the strength of this, Manget in the next few days made a binding commitment with the Commodity Credit Agency of the Federal Government for the storage of

---

4. The instrument is too long to be set out here. No serious attack is made on this summary of it in the District Judge's opinion:

It granted " * * * very broad powers [to Valentines] to vote all of the stock standing in the name of Louis Levy or in which Louis Levy had any interest, for any and all purposes, including but not limited to a plan or plans for the dissolution of said corporation and the distribution of its assets among the creditors of the corporation, and then to the stockholders as their interest might appear. This power of attorney and proxy was specifically made irrevocable, and it was stated that it was granted, among other things, for the purpose of facilitating the reorganization, or dissolution, liquidation, and distribution of the assets of the corporation in such manner as Valentine 'in the exercise of its sole and absolute discretion may deem to be for the best interest of all of the stockholders, without intervention on my part.' "

Later on the District Judge stated:

"The control of all of the stock was held completely by the Valentines by virtue of the power of attorney executed by Levy * * * [who] * * * recognized that the Valentines had an interest in the corporation and with this knowledge gave [Valentines] as broad powers as language could express * * *."

5. This included at one stage, incidentally, the planned purpose (or hope) to make a sale at an apparent sales price of $240,000 whereas in fact it would be $280,000 with $40,000 going to Levy (less 25% fee to Berkowitz).

cotton owned by the Government under the cotton program. Although there is not, to this good day, the slightest whisper of a faint suggestion of even a possible basis for the action, when Valentines found out about the lease, they, as the "actual" controlling owner instructed the President and Secretary on November 22, 1955 to disavow the lease on behalf of the corporation. They did. This put Manget, Jr. on the spot. Cotton was moving forward to Laurel, Mississippi. With no storage facilities available, Manget was exposed to great liabilities to the Government in freight, demurrage and other claims.

Berkowitz was still then very active in behalf of Levy. And as a solution to Manget, Jr.'s predicament urged strongly that he purchase the properties of Laurel. Levy, through Berkowitz' indefatigable correspondence, was, of course, fully aware of the Valentine-forced repudiation of the lease by the corporation. This resulted in the meeting of December 9, 1955, at Laurel to which we referred earlier. In anticipation that the sale for $280,000 to Manget, Jr. would be consummated, Welch, the Secretary and counsel, had been instructed to and had prepared the formal bills of sale, conveyances, resolutions, and other papers required to effectuate the transfer. Preparation of these documents is important in view of the events occurring on December 27 at which time these very same documents were formally executed and delivered. However, as we mentioned above, that trade fell through when the Valentines declined to warrant corporate liabilities. As there was apparently the impression that Berkowitz' intervention for Levy was perhaps an obstacle, Manget, Jr. sought, and obtained, Berkowitz' permission to discuss the matter directly with the Valentines. Late on the evening of December 9, these negotiations resulted in an option from Valentines giving Manget, Jr. the right, up to December 27, to purchase all of the stock of Laurel for $120,000. As this was a commitment by Valentines to sell stock owned by Levy, the option was expressly "subject to the approval of * * * Berkowitz * * * and * * * Levy * * *." A few days later, on December 12, Valentines made a telegraphic offer from New York to Manget, Jr. to sell all assets (less the exceptions) for $275,000 (plus an escrow item for contingent liabilities). The telegram stated "This offer runs concurrently with option dated December 9, to buy stock and expires noon December 27 subject to consents and general releases from Levy and Berkowitz * *." Between December 16 and 19, numerous telegrams were exchanged in which the Mangets were still trying to work out a lease arrangement. On December 19, Levy discharged Berkowitz. In the meantime, Manget, Jr. had requested evidence of Valentines' authority to act, and on December 21 Valentines sent Manget, Jr. a copy of the October 1955 power of attorney (see note 4, supra). On December 23 Manget, Jr. sent two telegrams to Valentines which purported to accept options 1 and 2 and a third option which oddly enough was simply lost to everyone's recollection six years later. But as we point out in some detail later, both in the Valentine version and the Manget version it is positive that neither party considered that a trade had yet been made. Manget, Jr. wired Valentines on December 25 binding himself to accept both offers. The Valentines and Manget, Jr. then agreed to meet in New York on December 27 to work out some acceptable trade. The occurrences of that day are in our view crucial. We read the events as did the District Judge.

According to Manget, Jr., then in New York, and David Welch, the Mississippi lawyer, Wright, the President, and Manget, Sr., all three of whom were in Laurel, Mississippi, on December 27, this is what happened. The meeting commenced early on December 27. By 9:30 A.M. Manget and Valentine had reached a firm agreement by which assets would be sold by the corporation for $275,000. Valentine then called Welch in Laurel instructing him to hold a Board of Directors meeting and send a telegram stating in effect that the Board approved what it

understood was an opportunity to sell assets for $275,000. In one of these phone calls, Valentine also instructed Welch to have the conveyances executed and delivered [6] on further, formal telephone instructions. These instructions were received late on the afternoon of December 27. At that time the conveyances were delivered to Manget, Sr. who gave his promissory note in the sum of $275,000 in exchange therefor.[7]

After the firm agreement to sell and purchase assets was made and all that remained was the mechanics of formal consummation of the transaction by those then located in Laurel, Mississippi, the discussion opened up for the first time that day between Manget, Jr. and Valentine concerning the sale and purchase of stock. This began after lunch. While they are in disagreement as to the activities earlier that day, all are in substantial agreement that a detailed 3-page single-spaced contract was drafted between Valentines and Manget, Jr. (to be executed later by Manget, Sr. as well) for the transfer of Valentines' "stock position." The price was $120,000. The contract covered stock owned by Valentine, as well as stock held by them and currently in their name, as security for Levy's debts which were likewise transferred and assigned. It also provided for the substitution of Manget for the Valentines under Levy's October irrevocable power of attorney. These papers, attached to a bank draft, were put through a New York bank for collection in Georgia. Through more or less routine collection delays the draft was not paid until about January 13, 1956.

But the story told by the Valentines was quite different. Instead of discussing the sale of assets, the sale of assets was never mentioned, not even a single time. What, and all, they say was discussed was the purchase by Manget, Jr. of Valentines' stock position. This difference in their version was neither doubtful nor based on mere inference. The dispute was outright, absolute, flat and categorical. Valentines specifically and repeatedly denied emphatically—point by point—the contrary testimony of Manget, Jr. as well as that of Wright, the President, and, more important, that of Welch, the Mississippi lawyer. They specifically denied the telephone instructions testified to by Welch, the request for the telegram, or the instructions to deliver the conveyances effectuating the transfer of assets. The Valentine version was wholly and simply that the discussion began immediately on acquisition of Valentines' stock and so-called position. The trade, so they testified, was shortly made and the whole day was consumed in drafting and modifying the rather complicated legal instrument required to transfer effectual enjoyment of all of the stock in view of the fact that, at most, only 30% was beneficially owned by the transferors.

■ Not only was the fact controversy a spectacular and sharp one. It furnished the seeds for decisively different legal conclusions depending on the resolution of it. Thus on Levy's theory—adopting the Valentine version—Manget, Jr. first bought stock under circumstances placing the purchaser in effective control of the corporation. That meant that sale of assets from the corporation to Manget, Jr. was made by, through, and to a single person. This would be the classic case of a controlling stockholder selling to himself in violation of his fiduciary duty to the corporation (and probably that portion of the corporate stockholders who were not on the "inside"). Once that occurred, this would set in train the substantial burden of restoring property thus acquired. This could well include consequent profits and gains. And this might be true quite without regard to whether the price ($275,000) was, or was not, fair and reasonable.

---

6. They had previously been prepared and approved for the December 9th meeting.

7. In view of the record proof of the financial, business and moral integrity of the Mangets, this note was substantially the equivalent of cash.

We can also assume that these consequences would flow if ostensibly there was first a sale of assets though the circumstances were such as to require a finding that the earlier asset sale would not have been made had it not been agreed that the stock would thereafter be purchased. This is so because controlling stockholders cannot jeopardize the interest of the corporation (or minority stockholders) by allowing their self-interest in the planned disposition of their personally owned stock to be the indispensable condition precedent to a sale of assets.

On the other hand, under the Manget version the transaction under attack—the sale and purchase of assets— was made before Manget was, or became, a stockholder. More than that, neither the hope nor the expectation of acquiring stock ownership, entered into or affected, one way or the other, the earlier sale and purchase of assets. A purchaser of assets is not in a fiduciary position. He owes no duty to the corporation, or through it, to minority stockholders. Of course while a purchaser of assets would generally have no fiduciary duty toward the selling corporation (or its stockholders), it would certainly bear the obligation of full accountability were the purchaser a knowing party to a breach of duty on the part of those acting for the corporation. But, accepting the Manget version, there is not the slightest word of testimony here that Manget was, or ought to have been, aware that Valentines were violating any trust toward the corporation or Levy. If these actions constituted a violation of duty by Valentine to the corporation or to Levy, knowledge of it was not attributable to Manget, Jr.

The fact dispute was there. It was crucial in legal consequence. It had to be resolved. This the trial Judge did. He chose to believe the Manget version, and he articulated this in many ways. Just as positively he rejected the Valentines' version. With it, the whole Levy case collapsed.

We have not the least difficulty in stating why we find it so easy to accept these conclusions, both factual and legal. It is equally easy to reject those reasons urged by Levy as demonstrating that the findings were clearly erroneous.

We start with the positive premise that notwithstanding the earlier option of December 9 to purchase stock and the subsequent option of December 12 to purchase assets and Manget's telegrams reflecting an acceptance of both of them, it is clear that these events had nothing to do with the agreements or transactions of December 27. In this regard the Valentines are as positive as is Manget, Jr. In the first place, while one who has purchased assets could thereafter purchase stock (as was done on the Manget version), it would hardly make sense to make an agreement to purchase stock and then make an agreement with the corporation acting through owners thus displaced for the purchase of corporate assets. More important, this option of December 9 expressly required that Berkowitz and Levy consent to any such trade. This was because Valentines were there presuming to commit themselves (and Levy) to the sale of stock some of which was owned by Valentines but most of which was owned by Levy. No effort was made by Valentines to secure that consent. This was not an oversight. Nor was it a failure to obtain consent. Rather, it was because this was a new trade. Valentine, whose veracity Levy vouchsafed, regarded it as an entirely new trade. And accepting the Valentine, or the Manget version, it assuredly was. The prior option was for the sale and purchase of the stock. The contract executed late on December 27 in New York was not the sale of stock (save for Valentines' 30%). It was a transfer of Valentines' stock position as to Levy's stock. This was more than a difference in terminology. For no one was certain just what stock Levy owned, and in any case all that Valentine could sell was its security interest in Levy's stock.

This confusion in Levy's ownership and the uncertainty as to just what stock

was owned and by whom, also demonstrated why a stock purchase was inadequate to meet Manget's desperate needs. Manget had cotton on the way. Manget already had one lawsuit in Mississippi in his effort to specifically enforce the lease. Manget needed storage space, not corporate stock certificates. Acquiring Valentines' 30% stock interest would give them no assurance of needed storage facilities. Acquiring Valentines' security interest in Levy's stock (70%) would leave Mangets with only such rights of control as might be appropriate to protect its interest as a creditor-assignee. In the meantime, Levy would have, or could make a substantial showing of a right of effectual control. Levy's treatment of Berkowitz and his conduct generally in relation to the corporation and his co-owners, all of which was then coming to light, was more than enough to lead any sensible businessman to recognize that Levy spelled trouble. Assets were needed. It is easy to understand, therefore, why the elder Manget cautioned Manget, Jr. to be certain that assets were firmly purchased before any discussions ever took place concerning stock acquisition. With all assets in hand the only purpose to be served by stock ownership was to make certain that the proceeds would be applied properly to discharge corporate debts so that the transferred assets would be free of creditor's claims or liens.

■ But there is something even more basic. The Judge did not have to articulate the reasons pro and con why an asset trade as opposed to a stock acquisition was more, or less, favorable or advantageous. He had an ordinary credibility choice to make. Which set of witnesses was telling the truth? This was a question of honesty, and reliability, in its rawest and most fundamental form.

Appellate Courts have spoken often and eloquently about the difficulty of fact choices from what is frequently called the cold, bare, printed record. Well, this record is bare. And it is also printed. But it is not cold.

The whole drama of this trial is revealed in the stenographic record. Cutting a big figure was Levy as the ardent champion for the corporation (although in reality only himself). One cannot read his testimony without sensing that the trial Judge was then and there rejecting it as clearly unreliable and unworthy of any credit. He was arrogant and impudent. His memory was conveniently faulty on nearly every significant thing. And, ironically, since his whole case depended upon acceptance of the Valentine version—and hence acceptance of the Valentines as credible witnesses—the only positive thing about Levy's testimony was that he thoroughly destroyed the reliability of the Valentines. Reciting the wierd and implausible story of his various transactions with the Valentines and Lynn in connection with stock in Laurel, he portrayed two things. The first was the picture of people who were shuffling stock certificates, papers and agreements around to defeat his rightful ownership. The second revealed that when and as the pressure from Levy or Lynn mounted, these people always pacified Levy, or Lynn, or both, by increased so-called salaries for which they never contributed a single idea. It was the payment of these amounts which constituted one of the largest contingent liabilities of the corporation since the Internal Revenue Service successfully contended that such salaries were excessive and unwarranted.[8]

Vouching for the Valentines as his witnesses, and resting his case necessarily on their story, Levy nevertheless could not conceal his contempt for them. In his own words he called them "sharp-

8. Of these payments, the trial Judge held: "The Court finds that the $72,000.00 (plus) paid to Levy was money that was not actually earned by Levy, but it was paid by the corporation pursuant to the instructions of Lynn and J. W. Valentine, and pursuant to an agreement entered into by and between Lynn and Levy * * *."

ies" and "tricksters" and persons who could not be trusted. The Judge was entitled to conclude that, as to this time at least, Levy spoke the truth.[9]

■ But this was not all. Levy's initial contract with Laurel was through Lynn, an ex-convict and obviously a fast talker in getting Levy into a number of things. Contrary to Levy's present contention that receipt of this evidence was erroneous, all of it was pertinent and proper since it bore on just what stock Levy owned, when, and where, and how he got it, where and how Valentines first obtained any of his, and how they ended up having it all. And this was especially relevant in demonstrating why Manget, Jr. could not possibly satisfy his imperative needs through the so-called stock sale option of December 9 or, for that matter, the acquisition alone of Valentines' "stock-position" on December 27.

The more Levy spoke, the worse his cause became. It soon developed that he had discharged Berkowitz, as he presumably had a right to do. But when Berkowitz sued him to establish his contingent fee contract, Levy defended on the ground that the employment contract was void as it was made on Sunday, though it was shortly established positively that this was untrue. After asserting an un-founded, untrue defense with a straight face, Levy then capitulated and Berkowitz obtained an agreed judgment in which Levy categorically affirmed the validity of the agreement! A year or so after the December 1955 Manget transaction, Levy was impleaded in a New York suit by the Valentines. The ownership asserted by him there was markedly different from his testimony below.

Finally, the deposition testimony of Valentine was categorically opposed to that of David Welch, a Mississippi attorney, who testified before the trial Judge, and, who, as a member of that Bar, was undoubtedly known to the Judge as a person who had demonstrated his reliability. Welch was positive that Valentine had called him by 9:30 A.M. on December 27. The telegram was sent stating exactly that Welch testified Valentine told him to transmit. And the record reflects the transmission and receipt of that telegram. The deeds were executed and delivered. And, without any doubt whatsoever, Manget, Sr. executed and delivered his note payable to Laurel for $275,000. If the Valentine version were credited, every one of these events which the Mississippi witnesses testified took place— and which the record shows without contradiction actually did take place—would become a complete mystery. These

---

9. This credibility choice, so critical to Levy's case, is not inconsistent with the trial court's finding that " * * * the Valentines were acting in good faith toward the corporation and toward Levy and were guilty of no breach of duty to either Levy or the corporation." Actually, in the absence of evidence and a finding that Manget, Jr. was charged with knowledge of any such supposed breach of duty by Valentines *vis-a-vis* Laurel, Levy, or both, this finding was superfluous. But, in any event, there was a basis for the finding since the duty of the Valentines as persons in control (largely by reason of Levy's own power of attorney) in effectuating the corporation's previously adopted policy of dissolution was to dispose of the assets at a fair price. There is not a single stitch of evidence to show that the properties then were of a value in excess of $275,-000. Actually, of course, Levy through Berkowitz had tried to consummate such a sale for $280,000. The breach of duty, if there was any, was in the distribution by the Valentines of any net proceeds. And here the pickings were slim. After discharge of corporate liabilities (estimated approximately $148,000), only about $125,000 was available for distribution. This corresponded with the $120,-000 paid to Valentines for the "stock position." Levy does not here challenge his debts to Valentines aggregating $90,-000, thus leaving not over $30,000 to $35,000 for division between the two in proportion to their stock ownership (70%–30%). So far as Mangets are concerned, they made clear below, and here, that they respect Levy's ownership of the stock (subject to the debts assigned by Valentines to Mangets) and if Levy has not received a proper accounting from the corporation, they acknowledge their obligation to account fully and in good faith.

events had no purpose at all apart from the sale of assets. They were completely unnecessary to a transaction for the sale of stock. And yet it must be remembered that the Valentines were positive that at no time on December 27 morning, noon, afternoon or evening did they discuss or conclude an agreement for asset sales. When the Judge credited the testimony of David Welch, the other Mississippi witnesses and that of Manget, Sr. as to these occurrences, it destroyed altogether that of the Valentines.

That leaves only one further contention. On the Manget version, they acknowledge that purchase of Valentines' stock position was discussed in the afternoon, and that this led to the stock position contract executed in New York late that evening. At the same time it is uncontradicted that the formal execution and delivery of the bills of sale, deeds of conveyance, and other papers formally evidencing the asset sale was not made in Laurel, Mississippi until that afternoon or evening. Consequently, it is urged that, even on the Manget version, the stock purchase came prior to the asset acquisition. That might be so were this determined by formal papers. But one thing is positive. The Valentines, with the complaining Levy's full consent (including his power of attorney), were in full control of Laurel. Wright and Welch, while officers and directors, did what the Valentines demanded. This they had done, for example, in the lease to Manget, repudiated by the corporation, under Valentines' instruction. Valentines' instructions to Welch to take corporate action was merely to memorialize in suitable form the agreement then made, and which he had full authority to cause to be made. The corporate sale of all assets was therefore made and consummated before the first discussion that day concerning sale of stock or stock-position.

The case turned on credibility choices. The trial Judge is to make that choice. He made it. There it ends.

Affirmed.

RIVES, C. J., I concur in the result.